## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **OLIVER EDWARDS, III, an individual,**<br><br>**Plaintiff,**<br>**v.**<br><br>**CHICAGO BRIDGE & IRON COMPANY,**<br>a Utah corporation,<br><br>**Defendant.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 1:17-cv-00158-DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Defendant Chicago Bridge & Iron Company's Motion for Summary Judgment. The court held a hearing on the Motion on August 13, 2019. At the hearing, Plaintiff was represented by Michele Anderson-West, and Defendant was represented by Raul Chacon and Derek Langton. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the Motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

In January 2016, Plaintiff Oliver Edwards, III ("Edwards") moved to Utah from Pennsylvania to get a fresh start in life. Defendant Chicago Bridge & Iron Company ("CB&I"), a leading provider of technology and infrastructure for the energy industry, hired Edwards to work as a pipe cutter in its Clearfield, Utah facility starting on April 25, 2016. Edwards is African-American and Muslim. He was one of only three African-American employees who worked at CB&I's Clearfield facility. He described his experience working there as "feeling like a chocolate chip in a glass of milk."

CB&I maintains an attendance policy for its employees. When employees violate the policy, they are assessed points. After an employee accrues a certain amount of points, CB&I will issue a disciplinary action against that employee. In July 2016, CB&I issued Edwards disciplinary actions based on his violation of the attendance policy—the first on July 12, 2016 and the second, which was a final written warning, on July 25, 2016. Edwards does not claim that either of the July disciplinary actions were discriminatory in nature. Then, on September 30, 2016, CB&I issued Edwards a written verbal warning (the "September 30 Warning"), but this time it, was unrelated to CB&I's attendance policy. Rather, CB&I issued Edwards the warning following an altercation that took place between him and a co-worker named Mike Tucker ("Tucker"). The altercation resulted from a dispute that Edwards had with Tucker in which Edwards claimed Tucker was failing to clean certain work saws after using them, leaving them dirty for the other workers on subsequent shifts. After Edwards approached Tucker to discuss the condition of the saws, Tucker mumbled something under his breath, and Edwards responded by stating, "Who the fuck you talking to?" During this confrontation, however, neither Tucker nor anyone else made any discriminatory comments towards Edwards.[1] A few days later, on October 3, 2016, CB&I issued Edwards another disciplinary action citing additional attendance violations (the "October 3 Warning").[2] This disciplinary action explained to Edwards that he had to go sixty days, starting from September 20, 2016, without an additional attendance violation. Edwards does not know whether he incurred any of the attendance infractions listed in the October 3 Warning.

---

[1] Edwards claims that Tucker said something under his breath that he could not hear. Nevertheless, Edwards cannot show nor are there any facts establishing that Tucker made a discriminatory comment at that time.
[2] The attendance infractions occurred on August 31, September 12, September 15, September 19, and September 20, 2016.

In addition to its attendance policy, CB&I also has a policy prohibiting workplace harassment and discrimination. The policy includes a procedure for filing a complaint when an employee encounters workplace harassment or discrimination. As a part of that procedure, employees who encounter harassment or discrimination should report the improper behavior to (1) their direct supervisor or their supervisor's boss; (2) their local human resources representative or CB&I's Vice President of Corporate Human Resources; or (3) CB&I's General Counsel. On September 30, 2016, Edwards reported to his foreman, Dustin Pundt ("Pundt"), that his co-worker, John Simpson ("Simpson"), had called him a "nigger" and made other racially hostile remarks. Pundt told Edwards to talk to Craig Hansen ("Hansen"), who then directed Edwards to talk to Troy Sauer ("Sauer"), CB&I's Human Resource Generalist. That same day, CB&I issued Simpson a disciplinary action based on his use of inappropriate language and directed him to refrain from using racial slurs. After that disciplinary action, Simpson never said the word "nigger" in Edwards' presence again. Apart from Simpson's use, no other CB&I employees directed such language towards Edwards.[3] However, Edwards also reported to Pundt that another one of his co-workers, Travis Thompson ("Thompson"), had asked him if he was "the type of Muslim that would perform radical acts." Edwards had responded to the question by asking Thompson if he was the "type of white guy that has the issue with mommy, and you go into a schoolhouse and start shooting innocent kids." After reporting this conduct to Pundt, Edwards and Thompson had no further incident or altercation.

On or around October 6, 2016, Edwards expressed further concern to Sauer regarding his co-workers' actions—especially Simpson. Edwards told Sauer that Simpson had called him a

---

[3] Edwards contends that during his first week of work at CB&I, he heard someone say "Man, they hiring niggers now?" *See* Def.'s Mot. Summ. J., Ex. B at 161 ("Edwards Dep."). Yet, he claims that the statement was not directed at him, and he did not take offense to it. *See id.*

"nigger"; made comments about a noose; put bananas on his desk and made racially-charged comments regarding them; stated that Edwards could dress as a slave for Halloween; made racially offensive jokes; placed a dirty glove in Edwards' food and claimed no one would care because he was black; expressed his preference not to work with Edwards; and denied him use of a crane that Edwards needed to perform his work. Sauer told Edwards that he would speak to Simpson and address the situation. Sauer initiated an investigation and interviewed witnesses, including Pundt, Simpson, Tucker, Thompson, and Dustin Douglas ("Douglas"), on October 10, 2016. That same day, CB&I issued Edwards a disciplinary action resulting in a day and a half suspension based on a confrontation that took place between him and Simpson (the "October 10 Suspension"). In that confrontation, Simpson approached Edwards (to supposedly apologize for using a racial slur in his presence), but Edwards refused to speak to him which led to Simpson raising his voice. Simpson later reported that during that confrontation Edwards threatened bodily harm against him. CB&I investigated Simpson's claim and, based on corroborating reports from various witnesses, issued Edwards the October 10 Suspension. Then, on October 18, 2016, CB&I issued Simpson a final written warning after he joked with members of CB&I's safety team that he nearly missed punching Edwards. In addition, Sauer issued a letter to Simpson in which he explained that use of the "n" word would not be tolerated; directed Simpson to avoid interacting with Edwards; cautioned that violence or threats and/or jokes of violence would not be tolerated; directed Simpson to only speak about Edwards in a professional manner; informed Simpson that any similar misconduct would result in him receiving additional discipline, up to and including termination of his employment; and told Simpson that he would be required to attend training on anti-harassment and discrimination. During his investigation, Sauer determined that Pundt had been aware that Simpson had used the word "nigger" and failed

to report it to Human Resources ("HR").  Consequently, Sauer issued Pundt a final written warning.

On October 20, 2016, Edwards reported to CB&I that Simpson took a parking space that Edwards was attempting to back into.  CB&I suspended Simpson while it investigated the incident.  Later, after Edwards reviewed video footage of the incident, he told CB&I's safety department that he thought his car was much closer to Simpson's car than it actually was.  On November 2, 2016, CB&I required all its employees at the Clearfield facility to attend an anti-harassment training.[4]  Thereafter, CB&I issued disciplinary actions against at least two employees who used the word "nigger" on the job site.  On November 15, 2016, Edwards reported to CB&I's safety department that he was dragged by a crane due to a malfunctioning remote control.  He stated that he had yelled for help from his co-workers, but they stood there and watched.  Although he suspected that his co-workers did not come to his aide due to discriminatory animus, he never heard any of his co-workers make discriminatory remarks, nor did he specifically report to HR that he thought his co-workers' inaction was due to discriminatory animus.  CB&I initiated an investigation into the crane incident on November 15, 2016 and interviewed several witnesses.  On November 16, 2016, Edwards reported to Sauer that he observed a comment written on a bathroom wall that said that Edwards was "a piece of shit low-life," but he did not know who had written the comment.  After Edwards reported it, Sauer investigated to see if he could determine who wrote the comment but was unable to determine the source.  Subsequently, CB&I painted over the comment.

---

[4] Edwards contends that the anti-harassment training was focused entirely on sexual harassment and had nothing to do with the type of harassment that he was allegedly suffering.  Moreover, he contends that all the employees treated the training as a joke.

On or about November 18, 2016, Edwards filed a Charge of Discrimination (the "Charge") with the Utah Antidiscrimination and Labor Division ("UALD") and the Equal Employment Opportunity Commission ("EEOC") claiming that CB&I had engaged in race and religious discrimination and retaliation against Edwards. On November 22, 2016, Edwards gave CB&I notice that he was considering quitting his job and gave one week's notice of his intention to resign. Edwards gave this notice because he no longer felt safe working at CB&I. CB&I construed Edwards' notice of resignation as an actual resignation, but Edwards did not actually intend to quit working at CB&I at that time. Rather, he first wanted to meet with counsel before deciding whether to continue working at CB&I. After CB&I accepted Edwards' resignation, he called CB&I the Friday after Thanksgiving and told Sauer that he would be returning to work the following Monday. CB&I had considered Edwards' employment terminated, though, and did not reinstate him.

Edwards filed the instant suit on October 18, 2017, raising four causes of action under Title VII of the Civil Rights Act of 1964: (1) discrimination; (2) retaliation; (3) hostile work environment; and (4) constructive discharge. Edwards contends that CB&I discriminated against him based on his race and religion and that his work environment was both objectively and subjectively hostile and abusive. He further claims that after he reported the discriminatory and offending conduct by his co-workers to his managers and supervisors, CB&I retaliated against him by holding him to a different standard and issuing him disciplinary actions. Finally, Edwards avers that his working conditions became so difficult and abusive, that he had no other option but to quit his job.

**DISCUSSION**

CB&I now seeks summary judgment on each of Edwards' claims. "Summary judgment is appropriate if the movant 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Sidlo v. Millercoors*, LLC, 718 F. App'x 718, 725 (10th Cir. 2018) (quoting *Adler v. Wal-Mart Stores*, Inc., 144 F.3d 664, 670 (10th Cir. 1998)). Accordingly, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the movant's motion must be denied. *Roberts*, 884 F.3d at 972 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**I.     Race-Based Claims**

**a.  Discrimination**

In cases where there is no direct proof that an employer discriminated against an employee on the basis of that employee's race, courts in the Tenth Circuit apply the three-part, burden-shifting framework outlined in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). Under the so-called "*McDonnell Douglas* framework," a plaintiff must first establish a prima facie case of discrimination by demonstrating "that (1) [he or she] is a member of a protected class, (2) [he or she] suffered an adverse employment action, (3) [he or she] qualified for the position at issue, and (4) [he or she] was treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). The Tenth

Circuit has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004)). "[M]ere inconvenience[s] or an alteration of job responsibilities" do not constitute adverse employment actions for purposes of a disparate treatment claim under Title VII. *Id.* (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)). Nevertheless, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Barlow*, 703 F.3d at 505 (quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)).

Once the plaintiff has established a prima facie case, "the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 603 (10th Cir. 2019) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer can make this showing, then "the burden shifts back to the employee to show the justification offered by the employer was pretextual." *Id.* To demonstrate that the employer's proposed justification constitutes pretext, the plaintiff must "show[] that the employer's proffered explanation is unworthy of credence." *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005), *as modified on denial of reh'g* (Dec. 20, 2005); *see also Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) ("Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the

employer did not act for the asserted non-discriminatory reasons."). In other words, the plaintiff "must call into question the honesty or good faith of the [employer's] assessment of his [or her] abilities." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1137 (10th Cir. 2004). It is simply not enough "that a factfinder could disagree with the employer's assessments." *Id.* at 1138. Moreover, "[t]he relevant inquiry is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

Because Edwards does not rely on direct evidence of discrimination, the *McDonnell Douglas* framework applies. For purposes of this Motion, CB&I concedes that Edwards can establish the first and third elements of his prima facie case in that he is African-American and was qualified to perform his position as a pipe cutter. This leaves the court with resolving whether Edwards suffered an adverse employment action and whether he was treated less favorably than others not in his protected class.

There are three[5] disciplinary actions that CB&I issued against Edwards that he claims constituted adverse employment actions: (1) the September 30 Warning; (2) the October 3 Warning; and (3) the October 10 Suspension.[6] The court finds, however, that the September 30 Warning and the October 3 Warning were not adverse employment actions for purposes of Edwards' disparate treatment claim. Neither of these disciplinary actions resulted in a significant

---

[5] As mentioned above, Edwards does not rely on either of the July 2016 disciplinary actions for attendance violations in support of his discrimination claim.
[6] Edwards contends that he was constructively discharged, which would constitute an additional adverse employment action. But as will be discussed below, the court is unpersuaded that Edwards was constructively discharged. Therefore, Edwards cannot claim that he suffered an adverse employment action based on constructive discharge for either his discrimination or retaliation claim.

change to Edwards' employment status, nor did they alter any of Edwards' job responsibilities. Rather, they simply directed Edwards to make changes to his conduct, which could result in further disciplinary actions if he failed to make such changes. Thus, because the court concludes that neither warning constituted an adverse employment action, Edwards cannot rely on those warnings in support of his disparate treatment claim.

On the other hand, the court concludes, and CB&I concedes, that the October 10 Suspension did constitute an adverse employment action for purposes of Edwards' disparate treatment claim. However, CB&I argues that the October 10 Suspension did not occur under circumstances giving rise to an inference of discrimination, and, in any event, CB&I contends that it treated employees outside Edwards' protected class similarly to how it treated Edwards. Accordingly, CB&I argues that it cannot be liable for discrimination based on the October 10 Suspension. In response, Edwards contends that CB&I gave preferential treatment to employees not of his protected class. For example, CB&I disciplined Edwards for cursing at Tucker even though CB&I employees curse on a regular basis without be disciplined. Even worse, when Simpson called Edwards a "nigger," his disciplinary action stated that he had used a "racial slur in a friendly, joking manner." Edwards also avers that he can establish his prima facie based on the temporal proximity between him reporting discriminatory conduct and receiving disciplinary actions.

Based on the facts before the court, the court concludes that the October 10 Suspension did not occur under circumstances giving rise to an inference of discrimination. CB&I issued Edwards the October 10 Suspension because he threatened bodily harm against Simpson. This was corroborated by several other employees. Such circumstances do not give rise to an inference of discrimination. Moreover, the court is persuaded that Edwards was treated similarly

to other CB&I employees that were not members of his protected class. Although Edwards argues that he was disciplined for cursing, his argument overlooks the threatening nature of his words toward Tucker. While it is one thing to say a curse word, it is an entirely different thing for an individual to use utilize such language in a verbal assault against another. Edwards' argument fails to appreciate that distinction. In addition, Simpson is the employee in this case with whom the court can compare his treatment by CB&I to that of Edwards'. As already stated, CB&I suspended Edwards for threatening bodily harm directly against Simpson. Similarly, CB&I issued Simpson (1) a final warning when he joked to members of CB&I's safety team about nearly punching Edwards in the face and then (2) a suspension for the parking incident with Edwards. Edwards argues that he and Simpson were treated differently because he received a suspension for threatening physical harm while Simpson only received a final warning. Again, Edwards fails to appreciate the distinction between the two instances. On Edwards' part, he directly threatened Simpson. On the other hand, Simpson joked to *other individuals* about nearly hitting Edwards. But when the parking incident occurred—a direct confrontation between Simpson and Edwards—CB&I suspended Simpson. Therefore, based on these undisputed facts, the court is persuaded that both Edwards and Simpson were treated in a similar manner for comparable offenses.

As for Edwards' temporal proximity argument, that argument is more generally used by plaintiffs seeking to establish a retaliation claim. *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004) (explaining that a plaintiff can establish his or her prima facie case by showing that there was temporal proximity between the protected activity and the adverse employment action). Indeed, Edwards raises and the court will address that argument below. On his disparate treatment claim, however, that argument fits much less comfortably. Thus, because

Edwards has failed to produce sufficient evidence of the four elements above, the court concludes that CB&I's request for summary judgment on Edwards' disparate treatment claim is warranted.

Even assuming, *arguendo*, that Edwards had established a prima facie case for disparate treatment, whether by temporal proximity or otherwise, the court would still grant CB&I's Motion based on the *McDonnell Douglas* framework. Had Edwards first met the four elements above, the burden would then shift to CB&I to offer a legitimate, nondiscriminatory reason for the October 10 Suspension. CB&I has provided such a reason—that Edwards threatened bodily harm against another employee. Because CB&I proffered a legitimate reason for the October 10 Suspension, the burden shifts back to Edwards to prove that CB&I's proffered reason was pretextual. But Edwards has failed to demonstrate that the October 10 Suspension was pretextual. Edwards has not shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in CB&I's reasons for the October 10 Suspension that a reasonable factfinder would find them unworthy of credence. *Lobato*, 733 F.3d at 1289. Consequently, the court grants CB&I's Motion as to Edwards' discrimination claim.

### b. Retaliation

Like discrimination cases that lack direct evidence of discrimination, when there is no direct evidence of retaliation, courts once again operate under the *McDonnell Douglas* framework. *Braxton*, 769 F. App'x at 605. Under this framework, a plaintiff must first establish a prima facie case of retaliation by providing evidence of the following three elements: "(1) [the plaintiff] engaged in protected opposition to Title VII discrimination; (2) [the plaintiff] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217,

1227 (10th Cir. 2008) (quoting *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004)). For retaliation claims, an adverse employment action "is something that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). Thus, an important distinction exists in that "less is required to prove an adverse employment action for a retaliation claim than a discrimination claim." *Braxton*, 769 F. App'x at 605. For the third element, a plaintiff must establish a causal connection by presenting "evidence of circumstances that justify an inference of retaliatory motive." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)). Significantly, when the "protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Id.*; *see also Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) ("[I]f the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference.").

Again, once a plaintiff has established the prima facie elements of his or her retaliation claim, the burden then shifts to the employer to "proffer a legitimate, nondiscriminatory reason" for the adverse employment action. *Fye*, 516 F.3d at 1228. Importantly, "[e]stablishing a legitimate, nondiscriminatory reason is a burden of production and can involve no credibility assessment." *Id.* (quotation marks omitted). Once the employer has provided a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff who must then demonstrate that the employer's "proffered explanation is a pretext for retaliation." *Id.* A plaintiff can establish pretext for a retaliation claim in the same way a plaintiff can do so for a discrimination claim—that is, by "produc[ing] evidence of such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* Notably, unlike the third element of a plaintiff's prima facie case, pretext *cannot* be established based solely on temporal proximity. *See Annett*, 371 F.3d at 1241. Instead, courts impose a "more demanding" burden that "requires a plaintiff to assume 'the normal burden of any plaintiff to prove his or her case at trial.'" *Id.* (quoting *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).

Because Edwards does not rely on direct evidence of retaliation, the court will once again apply the *McDonnell Douglas* framework. As an initial matter, CB&I concedes that Edwards can establish the first two elements of his prima facie case for retaliation because (1) Edwards' September 30 report to Pundt and October 6 complaint to Sauer constituted protected activity; and (2) the September 30 Warning, October 3 Warning, and October 10 Suspension constituted adverse employment actions under the lower standard. As to the third element, CB&I contends that Edwards has failed to establish a causal connection between any of his protected conduct and any of the adverse actions. The court, however, finds CB&I's contention to be without merit because Edwards can establish a causal connection based solely on temporal proximity. As mentioned above, the Tenth Circuit has opined that if an adverse action takes place within a brief time period—up to a month and a half—of the protected activity, this alone is sufficient to establish a causal connection. *Conroy*, 707 F.3d at 1181. In this case, all of the adverse actions and all of the protected activity took place within a week and a half of each other. Accordingly, the court concludes that Edwards has established a prima facie case for retaliation.

Because Edwards has met his initial burden, the burden then shifts to CB&I to produce legitimate, nondiscriminatory reasons for each of the adverse employment actions. Bearing in

mind the Tenth Circuit's direction that CB&I's burden is one of production that involves no credibility assessment, the court concludes that CB&I has met its burden of proffering legitimate, nondiscriminatory reasons for its actions. CB&I has provided a legitimate, nondiscriminatory reason for each corresponding adverse employment action: (1) the September 30 Warning because Edwards verbally assaulted Tucker; (2) the October 3 Warning for attendance infractions; and (3) the October 10 Suspension because Edwards threatened bodily harm against Simpson. Consequently, the burden returns to Edwards to show that CB&I's proffered reasons were pretextual. On this point, the court concludes that there remain genuine issues of material fact precluding the court from granting CB&I's Motion. The court reaches this conclusion based primarily on the fact that all of the adverse employment actions took place within only a matter of days of Edwards engaging in protected activity. Indeed, there is a logical sequence of events, as indicated by the following timeline, from which a reasonable factfinder could rationally conclude that CB&I's proffered reasons are unworthy of credence:

- September 30: Edwards reports racially discriminatory conduct to Pundt and is then issued a disciplinary action that same day;
- October 3: Edwards receives a disciplinary action based on attendance infractions that took place between August 31 and September 20;
- October 6: Edwards raises further concerns with Sauer;
- October 10: CB&I suspends Edwards for a day and a half.

This timeline presents enough evidence at the summary judgment stage to create genuine issues of material fact as to whether CB&I's proffered reasons were pretextual.

In light of this conclusion, the court finds it necessary to emphasize the narrowness of its decision. The court recognizes that temporal proximity in and of itself is insufficient to establish pretext. But in circumstances such as these, where there are *multiple* adverse employment actions within only *a few days* of an employee engaging in *multiple* protected activities, the court is persuaded that it is enough evidence to warrant submission to the factfinder at trial. The court

15

is confident that cases involving these types of circumstances will be far and few between, and given their rarity, will not undermine the well-established principle that temporal proximity alone does not establish pretext.

Therefore, the court denies CB&I's Motion as to Edwards' retaliation claim.[7]

### c. Hostile Work Environment

To establish a claim of hostile work environment under Title VII, a plaintiff must prove "(1) that he [or she] belonged to a protected class, (2) that he [or she] suffered unwelcome harassment, (3) that the harassment was based on [race], and (4) that the harassment was so severe or pervasive that it altered a term, condition, or privilege of [his or her] employment and created an abusive working environment." *Sidlo*, 718 F. App'x at 728 (quotation marks omitted). Courts have further broken down these four elements into two requirements: a plaintiff must establish that "(1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bloomer v. United Parcel Serv., Inc.*, 94 F. App'x 820, 825 (10th Cir. 2004). Either way, the plaintiff "must prove both a subjective determination of hostility and that the environment was objectively hostile as viewed by a reasonable employee under the same or similar circumstances." *Sidlo*, 718 F. App'x at 728 (internal quotation marks omitted). "[D]emonstrating a few isolated incidents of racial enmity or sporadic racial slurs," however, is insufficient. *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Chavez*

---

[7] Lest there be any confusion, the court notes several important distinctions that allow Edwards' retaliation claim to proceed while granting CB&I's Motion on Edwards' discrimination claim. First, while only one of the September 30 Warning, October 3 Warning, and October 10 Suspension constituted an adverse employment action for Edwards' discrimination claim, all three constituted adverse employment actions for his retaliation claim. Second, as mentioned above, the temporal proximity argument primarily fits in the context of retaliation claims—not discrimination claims. Third, the timeline of events in this case simply makes a stronger argument in favor of retaliation than discrimination.

*v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)). "Instead, there must be a steady barrage of opprobrious racial comments." *Id.*

Even if plaintiff can establish a prima facie case of hostile work environment, "[e]mployers are not automatically liable for harassment perpetrated by their employees." *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001). There are three theories under which an employer may be held liable for the harassing conduct of its employees: (1) the actual authority theory; (2) the apparent authority theory; (3) and the negligence theory. *Id.* These first two theories are essentially theories of vicarious liability. *Id.* at 1259. "Generally, the vicarious liability theory applies only when the harasser is a supervisor, while the negligence theory applies when the harasser is a co-worker." *Chavez-Acosta v. Sw. Cheese Co., LLC*, 610 F. App'x 722, 729 (10th Cir. 2015). Under the negligence theory, the plaintiff bears the burden of showing that the employer's actions were unreasonable. *Hollins*, 238 F.3d at 1258. In other words, a plaintiff must prove that the employer "was itself negligent because 'it knew or should have known about the conduct and failed to stop it.'" *Id.* (quoting *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)). "Thus, the focus is not on whether the employer is liable for the bad acts of others, but whether the employer itself is responsible for *failing to intervene*." *Id.* (emphasis added). This determination requires the court to ask whether the employer's "remedial and preventative action was reasonably calculated to end the harassment." *Adler*, 144 F.3d at 676.

For purposes of this Motion, CB&I acknowledges that Edwards can establish a prima facie case of hostile work environment based on race. Nevertheless, CB&I avers that Edwards' cause of action must fail because CB&I adequately and properly responded to Edwards' claims of harassment. Conversely, Edwards contends that his workplace was permeated with

discrimination to the extent that it altered the conditions of his employment. Based on the facts before the court, the court agrees with CB&I.

Preliminarily, Edwards does not contend that he was harassed by any of his supervisors. Accordingly, vicarious liability does not apply in this case, and Edwards must rely on the negligence theory. The court must therefore consider CB&I's response to Edwards' reports of harassment. The first time that Edwards reported any discriminatory actions on the part of his co-workers to CB&I was on September 30 when he told Pundt that Simpson had called him a "nigger." Although Edwards claims that discrimination was going on before September 30, CB&I cannot be held liable for discrimination of which it was entirely unaware and did not have an opportunity to correct. That same day, CB&I issued Simpson a verbal warning and directed him to refrain from using racial slurs or else he would receive further disciplinary action. Then, on October 6, Edwards informed Sauer of other alleged acts of discrimination perpetrated by other co-workers. Sauer responded by initiating an investigation and interviewing witnesses just two business days later, on October 10. This investigation resulted in CB&I issuing Simpson a final written warning for joking about nearly punching Edwards, and Sauer issuing Simpson the cautionary letter described above. In addition, Sauer issued Pundt a final written warning after he learned that Pundt was aware of employees saying the word "nigger" but had failed to report it. Moreover, CB&I (1) required its employees at the Clearfield facility to attend an anti-harassment training; (2) issued disciplinary actions to other employees who were heard saying the word "nigger"; (3) worked to figure out who wrote the comment about Edwards in the bathroom; (4) investigated the crane incident; and (5) suspended Simpson after the parking lot incident with Edwards.

Based on these facts, the court concludes that CB&I took adequate and necessary steps that were "reasonably calculated to end the harassment." *Adler*, 144 F.3d at 676. Consequently, Edwards has failed to establish that CB&I is liable for the harassment perpetrated by its employees. Therefore, the court grants CB&I's Motion on Edwards' hostile work environment claim.

### d. Constructive Discharge

For his fourth cause of action, Edwards asserts a claim for constructive discharge. However, constructive discharge is not an independent cause of action under Title VII. *Baker v. Baxa Corp.*, No. CIV.A. 09-CV-02034, 2011 WL 650002, at *1 (D. Colo. Feb. 11, 2011) (explaining that constructive discharge is not a standalone claim); *see also Hammel v. Marsh USA Inc.*, 79 F. Supp. 3d 234, 245 (D.D.C. 2015) ("Courts in this circuit have held that constructive discharge is not an independent basis for Title VII liability."); *Reed v. Action Prod., Inc.*, No. CIV. 12-409-JKB, 2012 WL 2711051, at *2 (D. Md. July 6, 2012) ("Constructive discharge, however, is not an independent basis for relief . . . ."). Instead, constructive discharge is a theory by which a plaintiff may establish that it has suffered an adverse employment action. *Green v. Brennan*, 136 S. Ct. 1769, 1776–77 (2016); *see also Wells v. City of Alexandria*, No. 03-30750, 2004 WL 909735, at *3 (5th Cir. Apr. 29, 2004) ("Under federal law, the constructive discharge doctrine is an alternative way of proving an adverse employment action in Title VII and other cases, but constructive discharge is not itself a cause of action."). The court will therefore analyze Edwards' claim for constructive discharge in the context of an adverse employment action.

When analyzing whether an employee has been constructively discharged, courts apply an objective standard. *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1325 (10th Cir. 2004).

"The plaintiff's burden in establishing constructive discharge is substantial." *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008). Constructive discharge occurs when "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that [he or she] had no other choice but to quit." *Sandoval*, 388 F.3d at 1325 (quoting *Sanchez*, 164 F.3d at 534). Importantly, the "mere existence of discrimination will not normally constitute the kind of intolerable conditions that would make a reasonable person feel compelled to quit." *Fischer*, 525 F.3d at 981 (quoting 1–15 *Larson on Employment Discrimination* § 15.08 (2007)). Again, the "conditions of employment must be objectively *intolerable*; the plaintiff's subjective views of the situation are irrelevant." *Sandoval*, 388 F.3d at 1325 (emphasis added).

The court concludes that Edwards has failed to meet his substantial burden in showing that he was constructively discharged. The court reaches this conclusion based on two reasons. First, Edwards gave a one-week notice of his intention to resign. In other words, he was willing to work at CB&I for another week. His willingness to continue working at CB&I, even if just for another week, tends to undermine his claim that his working conditions were objectively intolerable. This is only further supported by the second reason: although CB&I construed Edwards' notice as a resignation, Edwards testified that he did not actually intend to quit.[8] Rather, he wanted to first confer with his counsel and make a subsequent decision about whether to continue working at CB&I. Notably, after CB&I accepted Edwards' recognition, he called CB&I the Friday after Thanksgiving to see if he could return to work at CB&I the following

---

[8] Despite Edwards' claim that he did not intend to quit working at CB&I, the one-week-notice document produced by CB&I—and signed by Edwards—states the following: "Today at approxamitly [sic] 8:00 Oliver gave his one week notice[.] As of tdoay [sic] 11/22/16 Oliver will get paid up to and including 11/25/15." *See* ECF No. 24-24.

Monday. Based on these facts, and Edwards' own testimony that he wanted to resume working at CB&I, the court concludes that Edwards has failed to demonstrate that his working conditions were objectively intolerable. Edwards has therefore failed to establish that he was constructively discharged and so cannot rely on a constructive discharge theory as the basis of for an adverse employment action.

Accordingly, the court grants CB&I's Motion on Edwards' claim for constructive discharge.[9]

## II.     Religion-Based Claims

Along with his claim that CB&I discriminated against him based on his race, Edwards avers that CB&I and its employees discriminated against him based on his religion. Edwards has produced evidence of a single comment made to him by co-worker—the comment made by Thompson—that was based on his religion. After Edwards reported that comment to Pundt, Edwards and Thompson had no further altercation. Thus, the entirety of Edwards' religion-based claims hinge on the Thompson comment. For the following reasons, the court concludes that summary judgment is warranted on each of Edwards' religion-based claims. First, Edwards' religion-based disparate treatment claim fails for precisely the same reasons as his disparate treatment claim based on race. Second, his retaliation claim fails because he simply failed to produce sufficient evidence of religious-based animus. Third, Edwards has failed to establish the prima facie elements of a hostile work environment claim based on religion. "[T]he run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colorado Springs*,

---

[9] CB&I also argues that Edwards did not exhaust his administrative remedies for his disparate treatment and retaliation claims inasmuch as they relate to Edwards' purported constructive discharge. Because the court concludes that Edwards was not constructively discharged, however, the court need not address this argument.

666 F.3d 654, 664 (10th Cir. 2012); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("A recurring point in these [hostile work environment] opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'") (citation omitted).  The court therefore grants CB&I's Motion on each of Edwards' claims to the extent that they are based on religious discrimination.

## CONCLUSION

Based on the foregoing reasoning, CB&I's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  CB&I's Motion is granted as to Edwards' race-based claims for discrimination, hostile work environment, and constructive discharge, as well as all of Edwards' religion-based claims.  CB&I's Motion is denied as to Edwards' race-based retaliation claim.

Dated this 30th day of September, 2019.

BY THE COURT:

DALE A. KIMBALL,
United States District Judge